**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SADEK R. EBEID, M.D., ex rel.
United States of America,
                    *Plaintiff-Appellant,*

v.

THERESA A. LUNGWITZ; EDWARD C.
IRBY (MRS.), AKA Margaret Irby,
individually and DBA Health
Resource Center; HOME HEALTH
RESOURCES, INC., an Arizona
corporation; THE CROSSING HOSPICE
CARE, INC., an Arizona
corporation,
                    *Defendants-Appellees.*

No. 09-16122

D.C. No.
2:08-cv-00544-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
March 9, 2010—San Francisco, California

Filed August 9, 2010

Before: J. Clifford Wallace, Susan P. Graber, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

11249

**COUNSEL**

Michael J. Khori, Law Offices of Michael J. Khori, Irvine, California, for the plaintiff-appellant.

Paul G. Ulrich and Noel C. Capps, Renaud Cook Drury Mesaros, PA, Phoenix, Arizona, for the defendants-appellees.

Astrid G. Meghrigian, California Medical Association, Sacramento, California, for the amicus curiae.

**OPINION**

McKEOWN, Circuit Judge:

In this appeal under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3731, Sadek Ebeid claims that Theresa Lungwitz submitted false certifications to the federal government in connection with Medicare payments for three health care businesses: Health Resource Center, LLC (the "Clinic"), Home Health Resources, Inc. (the "Home Healthcare Agency") and The Crossing Hospice Care, Inc. (the "Hospice"). (We refer to the defendants collectively as "Lungwitz," except where it is necessary to identify individual defendants.) Central to Ebeid's claims are the allegations that Lungwitz engaged in the "unlawful corporate practice of medicine" and that referrals among the health care businesses were unlawful, which allegedly makes fraudulent every claim for Medicare reimbursement during that period.

"The FCA was enacted during the Civil War with the purpose of forfending widespread fraud by government contrac-

tors who were submitting inflated invoices and shipping faulty goods to the government." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265-66 (9th Cir. 1996). To encourage insiders to disclose fraud and thereby bolster enforcement, the FCA contains a *qui tam* provision that permits private persons (known as "relators") to bring civil actions on behalf of the United States and claim a portion of any award. *See* 31 U.S.C. § 3730(b), (d) (2008); *Hopper*, 91 F.3d at 1266 n.7. At the time that Ebeid filed his Second Amended Complaint,[1] the FCA imposed liability on anyone who, *inter alia*:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . . .

31 U.S.C. § 3729(a) (2008).

Ebeid, a private physician in Arizona, is not an insider in Lungwitz's businesses and does not raise a typical FCA claim

---

[1] Ebeid's original complaint and his First Amended Complaint were filed under seal. The district court unsealed the First Amended Complaint when the government elected not to intervene. Lungwitz answered, raising a Rule 12(b)(6) defense, among others. Ebeid moved to file a Second Amended Complaint, and the district court granted the motion without opposition. In a later Scheduling Order, the district court instructed the parties that further amended complaints should not be filed. The district court eventually granted Lungwitz's motion to dismiss the Second Amended Complaint for failing to meet the pleading standard of Rule 9(b).

that Lungwitz overcharged the government for services provided, or that she made express false certifications to the government to receive payment. Instead, Ebeid alleges that *all* of the Medicare billing submitted by Lungwitz was unlawful under a theory of implied false certification. Ebeid alleges that the illegal corporate structure of the health care businesses gave Lungwitz a prohibited amount of control over the medical decisions of physicians employed in the various enterprises and that the health care businesses illegally referred patients amongst themselves.

Ebeid raises a theory of implied false certification, "based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001). Although we reserved the issue of whether this theory was viable in *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 n.1 (9th Cir. 2006), we now join our sister circuits in recognizing a theory of implied certification under the FCA. *See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217-18 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005); *United States ex rel. Augustine v. Century Health Services, Inc.*, 289 F.3d 409, 415 (6th Cir. 2002); *Mikes*, 274 F.3d at 699. Nonetheless, even under this theory of implied false certification, Ebeid fails to plead fraud with sufficient particularity to satisfy the pleading standard under Federal Rule of Civil Procedure 9(b). Thus, on *de novo* review, we affirm the district court's dismissal of his Second Amended Complaint.[2] *See United States ex rel. Lee v.*

---

[2]The district court's order did not specify whether it dismissed the Second Amended Complaint with prejudice. After the Second Amended Complaint was filed, the district court notified the parties in its Scheduling Order that further amended complaints should not be filed. In addition, on appeal Ebeid does not challenge that order or seek leave to amend; instead he requests only reinstatement of the Second Amended Complaint. As we explain below, the Second Amended Complaint does not state a claim on which relief can be granted, and it would be futile to remand for its reinstatement. Thus, we construe the order as dismissal with prejudice.

*SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001).

## I. IMPLIED FALSE CERTIFICATION

[1] We address first whether the FCA contemplates an implied false certification claim. The first court to recognize implied false certification was the Court of Federal Claims in *Ab-Tech Construction, Inc. v. United States*, 31 Fed. Cl. 429 (Fed. Cl. 1994), *aff'd mem.*, 57 F.3d 1084 (Fed. Cir. 1995) (table). There, to participate in a government program, the defendant signed a "Statement of Cooperation," promising to comply with "the program's requirements for continuing eligibility." *Id.* at 432. The court found that claims for payment submitted to the government "represented an implied certification . . . of [the defendant's] continuing adherence to the requirements for participation," even though individual claims for payment did not require a certification of compliance. *Id.* at 434. Thus, the defendant's non-compliance rendered the claims "false," and liability attached under the FCA. *Id.*

[2] Since *Ab-Tech*, the Second, Sixth, Tenth, and Eleventh Circuits have endorsed the implied false certification theory. *See Mikes*, 274 F.3d at 699-700; *Augustine*, 289 F.3d at 415; *Conner*, 543 F.3d at 1217-18; *McNutt*, 423 F.3d at 1259. The Second Circuit in *Mikes* observed that "[f]oundational support for the implied false certification theory may be found in Congress' expressly stated purpose that the Act include at least some kinds of legally false claims and in the Supreme Court's admonition that the Act intends to reach all forms of fraud that might cause financial loss to the government." 274 F.3d at 699 (citations omitted).

In *Mikes*, the plaintiff argued that by submitting Medicare reimbursement forms, the defendant implicitly certified compliance with two Medicare statutes: 42 U.S.C. § 1395y(a)(1)(A), which prohibited payments for medical procedures that were "not reasonable and necessary for the

diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," and 42 U.S.C. § 1320c-5(a), which mandated a qualitative standard of care. *Mikes*, 274 F.3d at 700-01. The court held "that in submitting a Medicare reimbursement form, a defendant implicitly certifies compliance with § 1395y(a)(1)(A), but not § 1320c-5(a)." *Id.* at 702. The court reasoned that, in the Medicare context, "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Id.* at 700 (emphasis in original). Section 1395y(1)(A) expressly conditioned payment on compliance; however, § 1320c-5(a) did not because it established "conditions of *participation*, rather than prerequisites to receiving *reimbursement*." *Id.* at 701-02 (emphases added). Thus, § 1320c-5(a) established a condition of participation because it was prospective in nature, "directed at the provider's continued eligibility in the Medicare program, rather than any individual incident of noncompliance," as evidenced by its requirement that the Secretary of Health and Human Services may impose sanctions only after a peer review organization finds evidence of violations in "a substantial number of cases" and recommends sanctions. *Id.* at 702.

Although we have not addressed directly the viability of the implied false certification theory, our precedent regarding express false certification is instructive. Prior to our decision in *Hendow*, the leading case in this circuit on false certification was *Hopper*, 91 F.3d at 1266. In *Hopper*, we held that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Id.* Under this standard, we concluded that FCA liability cannot attach "where regulatory compliance was not a *sine qua non* of receipt of state funding." *Id.* at 1267. Thus, Hopper failed to state a viable claim where the forms on which his claims were submitted did "not contain any certification concerning regu-

latory compliance" and the statute at issue did "not require funding recipients to certify their compliance with federal law and regulations." *Id.*

Later, in *Hendow*, we clarified the four elements of a false certification claim: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174. To establish the materiality element, "the false statement or course of conduct must be material to the government's decision to pay out moneys to the claimant." *Id.* at 1172. To establish materiality, we pointed out that the term "certification" had no special significance; rather, "the question is merely whether the false certification—or assertion, or statement—was relevant to the government's decision to confer a benefit." *Id.* at 1173.

The defendant in *Hendow* argued that the materiality element was not satisfied because the incentive compensation ban under Title IV and the Higher Education Act of 1965 that it allegedly violated was "merely a condition of *participation*, not a condition of *payment*," and therefore provided no basis for an FCA claim under *Mikes*. *Id.* at 1176. We reasoned that the participation-payment differentiation set forth in *Mikes* was limited to the Medicare context. We also observed that, "[i]n the context of Title IV and the Higher Education Act, if we held that conditions of participation were not conditions of payment, there would be no conditions of payment at all." *Id.* In addition, although *Mikes* required that "the underlying statute 'expressly' condition payment on compliance," we stated that our precedent contained no such limitation. *Id.* at 1177.[3]

**[3]** The Second Circuit's analysis in *Mikes* of the implied false certification theory is persuasive and consistent with our

---

[3]We need not decide whether to adopt the Second Circuit's requirement in the Medicare context that "the underlying statute 'expressly' condition payment on compliance," as Ebeid's position fails regardless.

precedent. The implied false certification theory shares common limitations with the express false certification theory as delineated in *Hopper* and *Hendow*. Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted. Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim. Under both theories, "[i]t is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Hopper*, 91 F.3d at 1266. Likewise, materiality is satisfied under both theories only where compliance is "a *sine qua non* of receipt of state funding." *Id.* at 1267.

## II.  Pleading Standard Under the False Claims Act

**[4]** Having established that a relator may bring a claim of implied false certification, we now turn to pleading requirements under Federal Rule of Civil Procedure 9(b), and the question of whether Ebeid has met them. "[I]n alleging fraud or mistake," Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In addition, " '[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false.' " *Id.* (quoting *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)).

**[5]** To survive a Rule 9(b) motion to dismiss, a complaint alleging implied false certification must plead with particularity allegations that provide a reasonable basis to infer that (1) the defendant explicitly undertook to comply with a law, rule

or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation. We do not embrace the district court's categorical approach that would, as a matter of course, require a relator to identify representative examples of false claims to support every allegation, although we recognize that this requirement has been adopted by some of our sister circuits. *See United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007); *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006); *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004); *United States ex rel. Clausen v. Lab Corp. of Am.*, 290 F.3d 1301, 1312 n.21 (11th Cir. 2002). In our view, use of representative examples is simply one means of meeting the pleading obligation. We join the Fifth Circuit in concluding, in accord with general pleading requirements under Rule 9(b), that it is sufficient to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).[4]

Ebeid argues that the traditional pleading standards for fraud under Rule 9(b) should be relaxed here because the alleged fraud was of an extended duration and "the billing information is solely in Lungwitz's possession." To be sure, Ebeid is not privy to the details of patient billing. As he points out, in the securities fraud context we have held that "Rule 9(b) may be relaxed to permit discovery in a limited class of corporate fraud cases where the evidence is within a defendant's exclusive possession." *Lee*, 245 F.3d at 1052 (citing

---

[4]Likewise, a plaintiff may, but need not, provide representative examples to establish the payment element of the prima facie case. The rule 9(b) standard may be satisfied by pleading with particularity a reasonable basis to infer that the government either paid money or forfeited moneys due.

*Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987); *Deutsch v. Flannery*, 823 F.2d 1361, 1366 (9th Cir. 1987)). We are not persuaded that this limited principle should be applied in this case. To jettison the particularity requirement simply because it would facilitate a claim by an outsider is hardly grounds for overriding the general rule, especially because the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government.

While Ebeid is not required to allege "all facts supporting each and every instance" of billing submitted in violation of the Stark Act or the purported bar on the corporate practice of medicine, *Lee*, 245 F.3d at 1051, Rule 9(b) still requires Ebeid to plead the fraud with some level of specificity. Indeed, even under a relaxed standard, Ebeid must provide enough detail "to give [Lungwitz] notice of the particular misconduct which is alleged to constitute the fraud charged so that [she] can defend against the charge and not just deny that [she has] done anything wrong." *Lee*, 245 F.3d at 1051-52 (citing *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993)). Ebeid must also supply reasonable indicia that false claims were actually submitted. The Second Amended Complaint does neither.

## III.  EBEID'S SECOND AMENDED COMPLAINT

Although Ebeid's Second Amended Complaint invokes the framework of an implied false certification claim,[5] it fails to plead this claim with the particularity required by Rule 9(b). Ebeid alleges that "the United States would not have paid" the

---

[5]The Second Amended Complaint does not use the phrase "implied false certification" but it sufficiently raises this theory through allegations that the government paid claims because it believed Lungwitz was in compliance with laws upon which payment was conditioned. *See Hendow*, 461 F.3d at 1173 (explaining that the term "certification" has no special significance).

submitted claims had it known of Lungwitz's non-compliance with various state and federal laws. Ebeid alleges that Lungwitz violated the Arizona common law prohibition on the corporate practice of medicine, the Stark Act, 42 U.S.C. § 1395nn, and certain Medicare regulations contained in 42 C.F.R. Part 424, Subpart B. To the extent that any of these laws may form the basis for an implied false certification, Ebeid still fails to "state with particularity the circumstances constituting fraud or mistake," as required by Rule 9(b).

## A.    Corporate Practice of Medicine

[6] Ebeid alleges that the claims submitted to the government were false because the health care businesses "were engaged in the unlawful corporate practice of medicine." The Second Amended Complaint does not refer to any statute, rule, regulation, or contract that conditions payment on compliance with state law governing the corporate practice of medicine. Instead, Ebeid baldly asserts that had Lungwitz "not concealed or failed to disclose information affecting the right to payment, the United States would not have paid the claims." This conclusory allegation is insufficient under Rule 9(b).

## B.    Stark Act

[7] Ebeid also alleges that Lungwitz falsely implied compliance with the Stark Act. The Stark Act generally prohibits a physician from referring Medicare patients to entities in which the physician has a prohibited "financial interest." *See* 42 U.S.C. § 1395nn(a)(1). Although the Stark Act may provide a valid basis from which to imply certification, because it expressly conditions payment on compliance, 42 U.S.C. § 1395nn(g)(1) ("No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section."),[6] Ebeid simply

---

[6]Unlike 42 U.S.C. § 1320c-5(a), which the court in *Mikes* found insufficient as the basis of an implied certification claim, the Stark Act does not

alleges that Lungwitz "concealed and failed to disclose that the Clinic's physicians had a financial relationship to the Home Health Care Agency and the Hospice to which the physicians referred patients." The only clarification given is that allegedly unlawful "referrals . . . were made by physicians who were employed by and whose livelihood depended upon Lungwitz." These general allegations—lacking any details or facts setting out the "who, what, when, where, and how" of the "financial relationship" or alleged referrals—are insufficient under Rule 9(b). *Vess*, 317 F.3d at 1106. As with the corporate practice of medicine claims, a global indictment of Lungwitz's business is not enough.

## C.   Medicare Regulations

Related to the alleged Stark Act violations, Ebeid alleges that Lungwitz submitted claims for reimbursement while Lungwitz "and employee physicians had a significant financial or contractual interest in the referral of patients from the Clinic to the Home Health Care Agency and Hospice in violation of 42 C.F.R. [Part] 424, Subpart B."

Of the ten sections in Part 424, Subpart B of the Medicare regulations, Ebeid alleges a violation only of § 424.22, directed to home health services, which provides in relevant part:

> Medicare . . . pays for home health services only if a physician certifies and recertifies the content speci-

require continuous or numerous violations before a practitioner can be excluded from providing reimbursable services; rather, the Stark Act prohibits providers from submitting claims, or the government from paying claims, for "services furnished pursuant to a [prohibited] referral." 42 U.S.C. § 1395nn(a)(1)(B) & (g)(1). Accordingly, a plausible allegation of failure to comply with the Stark Act, stated with sufficient particularity to meet the requirements of Rule 9(b), might support a claim of implied false certification. Ebeid, however, fails to meet the threshold requirement of particularity.

fied in paragraphs (a)(1) and (b)(2) of this section, as appropriate.

. . . .

(d) A physician who has a financial relationship, as defined at § 411.354 of this chapter, with a [home health agency ("HHA")] may not certify or recertify the need for home health services or establish or review a plan of treatment for the HHA unless the financial relationship satisfies the requirements of one of the exceptions set forth in § 411.355 through § 411.357 of this chapter.

42 C.F.R. § 424.22.

Like the Stark Act, § 424.22(d) may serve as the basis for an implied false certification because it provides a condition of payment, not participation. Although Part 424 is entitled "Conditions for Medicare Payment," our analysis does not rest on the title. Instead we look to the specific text of the regulation, which provides that "Medicare . . . pays for home health services *only* if a physician certifies and recertifies" the need for home health care services. 42 C.F.R. § 424.22 (emphasis added). A physician in a prohibited financial relationship may not certify or recertify such need. *Id.* § 424.22(d). Therefore, certification of compliance with the ban on financial relationships prohibited under § 424.22(d) may be inferred by the submission of a related Medicare claim for home health care services.

**[8]** Ebeid alleges that Lungwitz and Irby "owned, controlled, and profited from" the health care businesses. Because referrals from the Clinic to the Home Health Care Agency "were made by physicians who were employed by and whose livelihood depended upon Lungwitz and/or Irby," Ebeid maintains that those referrals were made unlawful by "financial and contractual relationship between [Lungwitz] and the

physicians." Although § 424.22(d) provides a sufficient basis for implying certification, Ebeid's Second Amended Complaint fails to plead such a theory with the particularity required by Rule 9(b) for the same reasons germane to the alleged Stark Act violation.

## CONCLUSION

Although Ebeid articulates the framework of a claim for implied false certification, he fails to plead it with the particularity required of Rule 9(b). We affirm the district court's order dismissing the Second Amended Complaint with prejudice.

**AFFIRMED.**